ADAM MR. QUINN,
    *Plaintiff,*

v.

BRIAN GOULD & CITY OF BRISTOL,
    *Defendants.*

No. 3:19-cv-820 (VAB)

**RULING AND ORDER ON MOTION TO DISMISS**

Adam Quinn ("Plaintiff") has sued Chief Brian Gould and the City of Bristol (collectively, "Defendants"). Mr. Quinn alleges that the Defendants subjected him to a hostile work environment and retaliation, violating Title VII of the Civil Rights Act, as well as the Fourteenth Amendment of the U.S. Constitution's Equal Protection and Due Process Clauses. He also alleges negligent supervision, intentional infliction of emotional distress, and violations of the Connecticut Fair Employment Practices Act. Mr. Quinn sues Chief Gould in both his individual and official capacity.

Defendants have moved to dismiss claims against Chief Gould in his official capacity, as well as the equal protection, due process, negligent supervision, intentional infliction of emotional distress, and municipal liability claims against the City of Bristol. Defendants also contend that there is no basis for punitive damages.

Defendants have not challenged Plaintiff's claims under Title VII or the Connecticut Fair Employment Practices Act. As a result, those claims will proceed.

For the following reasons, the motion to dismiss is **GRANTED in part and DENIED in part.** All claims against Chief Gould in his official capacity are dismissed. The equal protection claim against Chief Gould in his individual capacity and the *Monell* claim against the City of

Bristol will both proceed. The substantive due process claim is dismissed against Chief Gould in his individual capacity. The negligent supervision and intentional infliction of emotional distress claims are dismissed as to Chief Gould in his individual capacity and the City of Bristol.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

Mr. Quinn currently lives in Shelton, Connecticut and identifies as "an [sic] Hispanic male of Puerto Rican ancestry." Compl., ECF No. 1 ¶ 4 (May 28, 2019). During the relevant time period, Chief Gould "was the Chief of the Bristol Police Department" of the City of Bristol. *Id*. ¶ 5. Mr. Quinn worked as a police officer in Bristol, serving the Connecticut Police Department. *Id*. ¶ 9. He is allegedly one of two Hispanic police officers in the Bristol Police Department. *Id*. ¶ 11. "Apart from two African-American [o]fficers," the department allegedly is comprised of approximately 121 officers who "are exclusively white, non Hispanic Caucasian." *Id*. According to Mr. Quinn, he "was treated differently and more harshly than his white non Hispanic counterparts, by both supervisors and fellow Officers." *Id*. ¶ 12.

Mr. Quinn alleges that "his response time to emergency calls for medical assistance has been monitored, evaluated and scrutinized by the defendants," scrutiny not given to the non-Hispanic white officers. *Id*. ¶ 13. He also alleges that he responds "to emergency calls in a manner substantially similar" to other white, non-Hispanic officers. *Id*. ¶ 14. Defendants allegedly scrutinized him more in order to "fabricate discipline against Mr. Quinn." *Id*. ¶ 15. As a result, Mr. Quinn allegedly received discipline for "his response times to a small number of calls," even though Defendants recognized "that he timely responded to the overwhelming majority of such calls." *Id*. The emergency response time of white, non-Hispanic officers

allegedly has never been monitored, "and no white non Hispanic officer has ever been disciplined for" emergency response times. *Id*. ¶ 16.

Mr. Quinn also alleges that he "has been disciplined more harshly than non Hispanic officers" for his use of force. Compl. ¶ 17. "Although other similarly situated non Hispanic officers [allegedly] have used force similar to or greater than that used by [Mr. Quinn], no other officer has been disciplined for use of force" in the Bristol Police Department for seven years. *Id*.

Mr. Quinn's supervisors, Sergeant Edward Spyros, Sergeant Craig Duquette, Sergeant Matthew Moskowitz, Lieutenant Dennis Daigneault, Lieutenant Michael Healey, and Chief Gould, all allegedly treated him "differently from his similarly situated non Hispanic white colleagues." *Id*. ¶ 19. And all of these supervisors allegedly are "white and non Hispanic." *Id*.

In addition to his supervisors, Officer Gregory Lattanzio and Supervisor Lieutenant Dennis Diangeault allegedly "made a false complaint about" Mr. Quinn. *Id*. ¶ 20. Because of the false complaint, non Hispanic white males in the Bristol Police Department allegedly sought and obtained "an arrest warrant for [Mr. Quinn], and subject[ed] him to arrest." *Id*. Mr. Quinn allegedly received a thirty-day suspension as a result. *Id*. ¶ 21.

Mr. Quinn further alleges that the "false statements of his white, non Hispanic colleagues" caused his subsequent investigation and discipline. *Id*. ¶ 22. He contends that "white, non Hispanic supervisors of the defendant City order[ed] Officers to make or participate in complaints against him," when no complaint would have been made otherwise. *Id*. ¶ 23. The false statements allegedly subjected Mr. Quinn "to numerous Internal Affairs Investigations and a written agreement subjecting him to close monitoring, [allegedly] all with the intention of terminating him" from the Department. *Id*. ¶ 24.

The Internal Affairs investigations are allegedly "substantiated." *Id.* ¶ 25. Mr. Quinn alleges that other instances "where white, non Hispanic officers of the defendant City engaged in similar or worse conduct than alleged against [Mr. Quinn]" were determined to be "not substantiated." *Id.* "Discipline, including further suspension," allegedly was imposed because of these allegedly unfair Internal Affairs investigations." *Id.*

Sergeant Duquette and Lieutenant Daigneault allegedlly made "racist remarks about Hispanics" to Mr. Quinn. *Id.* ¶ 26. The remarks allegedly "occurred at the workplace." *Id.* ¶ 27. The two officers allegedly made derogatory comments like, "Hey, we just arrested another Jose and maybe we should send his wetback ass back to Mexico[,]" and implied "all Hispanics are the same." *Id.* ¶ 27. Lieutenant Daigneault allegedly "has a history of harassment and discrimination." *Id.* ¶ 28. He allegedly "was forced to resign from the Glastonbury Police Department because of sexual harassment." *Id.* The City of Bristol allegedly knew of Lieutenant Daigneault's past when they hired him. *Id.* ¶ 31.

When Mr. Quinn allegedly complained of the discrimination and mistreatment of both Lieutenant Daigneault and Sergeant Duquette, neither "received anything more than a verbal reprimand from the defendant Gould for their conduct . . ." *Id.* ¶ 31. After the complaints were submitted, Chief Gould allegedly "ordered [] white, non Hispanic personnel to 'document every little thing on Mr. Quinn' . . . [to] further [discipline] him, up to termination." *Id.* ¶ 32.

In October 2017, Mr. Quinn allegedly overheard supervisor Lieutenant Healey "instruct another white, non Hispanic Sergeant, Ulric Berube, to [] scrutinize and document [Mr. Quinn]." *Id.* ¶ 33. Apparently Lieutenant Healey "said that he wanted [Mr. Quinn] to be documented" and that Mr. Quinn "was to be written up for any infraction, no matter how minor." *Id.*

On or about February 15, 2018, Defendants allegedly "found against [Mr. Quinn] in five (5) Internal Affairs Investigations." *Id.* ¶ 35.

Mr. Quinn alleges that the "harassment and discrimination is continuous and ongoing . . ." and that Defendants "have imposed, and continue[ ] to impose punishment [ ] and discipline upon [Mr. Quinn] in retaliation for his complaints, and because of his Hispanic race and/or heritage." *Id.* ¶ 35-36. Mr. Quinn allegedly suffers "an ongoing pattern of discrimination, harassment, disparate treatment, hostile work environment and retaliation." *Id.* ¶ 37.

Mr. Quinn claims that he has suffered and will continue to suffer future financial harm and loss "[a]s a direct and proximate result of the acts of the defendants[.]" *Id.* ¶ 41. His loss and suffering allegedly includes "loss of employment rights, duties, obligations or benefits, severe emotional distress, loss of personal and professional reputation, humiliation, embarrassment, loss of privacy, upset, anxiety, inconvenience, physical harm, loss of property, and loss of employment opportunities." *Id.*

### B. Procedural History

Mr. Quinn sought and received a right-to-sue letter from the U.S. Equal Employment Opportunity Commission and a Release of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities. Compl. ¶ 38.

On May 28, 2019, Mr. Quinn filed this Complaint against Brian Gould and the City of Bristol ("Defendants"). Compl., ECF No. 1 (May 28, 2019) ("Compl.").

On August 26, 2019, Defendants filed a motion to dismiss. Mot. to Dismiss, ECF No. 11 (Aug. 26, 2019) ("Mot. to Dismiss").

On December 13, 2019, Plaintiff filed a memorandum in opposition. Pl.'s Mem. of Law in Opp., ECF No. 18-1 at 10 (Dec. 13, 2019) ("Pl.'s Opp'n").

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

### A. The Official Capacity Claims Against Chief Gould

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City N.Y.*, 436 U.S. 658, 690 n. 55 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

"[I]n a suit against a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2001) (internal quotation marks and citations omitted). To the extent individual defendants are sued in their official capacities, "these suits should be dismissed because the municipal entities are the real parties in interest, and thus 'a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Phillips v. Cty. of Orange*, 894

F. Supp. 2d 345, 384 n. 35 (S.D.N.Y. 2012) (quoting *Graham*, 473 U.S. at 166 (collecting cases)).

As a result, district courts within the Second Circuit consistently dismiss claims asserted against officials in their official capacities as duplicative where the plaintiff has named the municipal entity as a defendant. *Phillips*, 894 F. Supp. 2d at 384 n. 35 (collecting cases); *see, e.g., Kanderskaya v. City of N.Y.*, 11 F. Supp. 3d 431, 435 (S.D.N.Y. 2014) (dismissing with prejudice claims against police officer in official capacity "because they are duplicative of [the plaintiff's] other claims against [the municipality]") *aff'd*, 590 F. App'x 112 (2d Cir. 2015); *Ferreria v. Town of E. Hampton*, 56 F. Supp. 3d 211, 237 (E.D.N.Y. 2014) ("Because the Town is named as a defendant in the instant case, the Court grants summary judgment as to all claims for the individual defendants in their official capacities."); *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 205 (E.D.N.Y. 2013) (dismissing official capacity claims against individual officers "because they are duplicative of the *Monell* claims against the [municipality]"); *Wallikas v. Harder*, 67 F. Supp. 2d 82, 83-84 (N.D.N.Y. 1999) (noting that "claims against municipal officials in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant" and dismissing federal and state law claims asserted against country sheriffs in their official capacities).

Defendants argue that all claims "as to Chief Gould in his official capacity should be dismissed, as they are duplicative of the claims against the City." Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 11-1 at 6 (Aug. 26, 2019) ("Defs.' Mem."). Because claims against individual officials are essential claims against the government entity itself and because any

resulting judgment would be redundant, Counts Two, Four, and Five against Chief Gould in his official capacity should be dismissed. *Id*. at 6-7.

Mr. Quinn responds that "[a]sserting official capacity claims against defendant Gould [] underscores the principal [sic] that Gould's actions are one and the same as the actions of the municipality and employer" for liability purposes. Pl.'s Opp'n at 10.

The Court disagrees.

Assuming Mr. Quinn would make a similar argument regarding his official capacity claims against Chief Gould, his official capacity claims against Chief Gould must be dismissed. "'As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects, other than name, to be treated as a suit against the entity.'" *O'Connor v. Pierson*, 568 F.3d 64, 71 (2d Cir. 2009) (citing *Graham*, 473 U.S. at 166).

Accordingly, Mr. Quinn's due process and equal protection claim (Count Two), negligent supervision (Count Four), and intentional infliction of emotional distress (Count Five) against Chief Gould in his official capacity will be dismissed.

**B. The Equal Protection Clause Claim**

The Equal Protection Clause of the Fourteenth Amendment protects public employees from race discrimination and retaliation for complaining about race discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring discrimination and retaliation claims under 42 U.S.C. § 1983 against a "responsible person acting under color of state law." *Id*. at 87; *cf. Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) ("A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983."). Any state employee "acting in his official capacity" acts "under color of state law." *Id*. at 88 (internal quotation marks omitted). A § 1983

claim must also allege that "as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges.'" *Padilla v. Harris*, 285 F. Supp. 2d 263, 267 (D. Conn. 2003) (quoting *Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998)).

Fourteenth Amendment claims involving allegations of employment discrimination are evaluated under similar standards as those used in Title VII employment discrimination cases. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of . . . the Equal Protection clause."). Employment discrimination cases under the Equal Protection Clause, then, are subject to the burden-shifting standard outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Defendants argue that Mr. Quinn's equal protection claim should be dismissed because Mr. Quinn has failed to state a claim. Defs.' Mem. at 7. Specifically, Mr. Quinn cannot assert a claim under a "class of one" theory because it is inapplicable in the public employment context. *Id*. at 8. Nor can Mr. Quinn assert a claim under a selective enforcement theory, because, in Defendant's view, "he has failed to identify a single similarly-situated employee to whom he might be compared." *Id*. at 9. Mr. Quinn's allegations that he "was monitored more closely and disciplined more harshly . . . failed to identify employees by protected classification or who have engaged in materially similar conduct, such that they might be considered similarly-situated comparators." *Id*. at 10-11.

Mr. Quinn contends that he is "neither asserting a 'class of one' theory of liability, nor is he asserting official capacity claims against defendant Gould, where such claims are duplicative

of claims asserted against the defendant Bristol[.]" Pl.'s Opp'n at 10. Instead, in his view, he has brought a selective enforcement equal protection claim and that he has sufficiently alleged 'he has been selectively treated compared with others similarly situated." *Id.* at 11-12. Specifically, he "has identified with the requisite, <u>Iqbal</u> satisfying certainty, the similarly situated comparators to whom he compares himself and his treatment at the hands of the defendants." *Id.* at 12 (emphasis in the original).

In their reply, Defendants reiterate that Mr. Quinn "has failed to plead facts sufficient to allege that he was treated differently than similarly situated comparators." Reply at 3. In their opinion, "the mere fact that Plaintiff alleges he is one of only two Hispanic police officers does not lend any factual support to his allegation that he is treated differently than similarly-situated non-Hispanic officers." *Id.* His identification of the body of police officers with whom he worked is insufficient to support his claim. *Id.* at 4.

The Court disagrees.

A claim of selective enforcement "arises when the government seeks to apply the law to a plaintiff differently than it would to other similarly situated individuals for constitutionally impermissible reasons such as on grounds of a plaintiff's race or malicious intent." *Gray v. Town of Easton*, 115 F. Supp. 3d 312, 319 (D. Conn. 2015). A selective enforcement claim closely mirrors a class-of-one claim, and it requires "a plaintiff prove[] that '(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Brown v. City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 104 (2d Cir. 2000)).

Courts in the Second Circuit have applied different comparator standards for selective enforcement claims. *Compare Yajure v. DiMarzo*, 130 F. Supp. 2d 568, 572 (S.D.N.Y. 2001) (articulating selective enforcement test as "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent") *with Gray*, 115 F. Supp. 3d at 319 ("But because the two theories [selective enforcement and class-of-one] themselves are so similar, there is little reason to suppose why a selective-enforcement claim should not require the same high degree of similarity between comparators as the Second Circuit requires for a class-of-one claim."); *see also Hu v. City of N.Y.*, 927 F.3d 81, 93 (2d Cir. 2019) ("However, the similarity standard for an *Olech* claim is more stringent than the standard for a *LeClair* claim. While *Olech* requires an "extremely high" degree of similarity between a plaintiff and comparator, *LeClair* merely requires a reasonably close resemblance" between a plaintiff's and comparator's circumstances.").

In the Title VII context which requires a plaintiff to be "similarly situated in all material respects," all material respects means the plaintiff and the comparator "were subject to the same performance evaluation and discipline standards" or "to show that similarly situated employees who went undisciplined engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). This inquiry "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's case, rather than a showing that both cases are identical." *Id.* (citation omitted).

Mr. Quinn argues that, besides the other handful of minority officers, none of the other 121 officers "shared his protective class characteristics." Pl.'s Opp'n at 12. He alleges that he "has been scrutinized and monitored more closely than his white, non Hispanic counterparts[,]" Compl. ¶ 13, that discipline was unequally applied, *id.* ¶¶ 15-17, that Internal Affairs

investigations against him were "substantiated" as opposed to white, non Hispanic officers' investigations were typically found to be "not substantiated," *id.* ¶ 25, and that he repeatedly endured racial slurs and derogatory comments, *id.* ¶¶ 26-28.

Mr. Quinn thus has pled his equal protection claim with sufficient particularity. *See Hu*, 9237 F.3d at 97 (applying a lower degree of similarity required in pleading a selective enforcement claim and finding plaintiffs "satisfied the standard of plausibility by alleging differential treatment by the same defendant . . . for the same conduct . . . at the same jobsite"); *Komatsu v. City of New York*, 2019 WL 4805904, at *6 (S.D.N.Y. Sept. 30, 2019), *appeal docketed* No. 19-3169 (2d Cir. Oct. 2, 2019) (*pro se* plaintiff sufficiently established comparators through "others standing in line" when plaintiff was repeatedly denied entry to events at which Mayor De Blasio was to attend).

Accordingly, Defendant's motion to dismiss Mr. Quinn's equal protection claim will be denied.

### C. The Due Process Claim

The United States Constitution provides, "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amdt. XIV, § 1. This provision "guarantee[s] more than fair process, and [] cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal quotation marks and citations omitted). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976).

"To award damages under 42 U.S.C.§ 1983 for [an] alleged violation of procedural due process, a court must find that, as a result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). Furthermore, a defendant in a § 1983 action may be held liable for damages, absent personal involvement in the alleged constitutional deprivation. *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended*, (Feb. 24, 2016).

"'To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Emmerling v. Town of Richmond*, 434 F. App'x 10, 11-12 (2d Cir. 2011) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009)); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 259 (2d Cir. 1999) (violation of the substantive standards of the Due Process Clause requires "conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.").

Defendants argue that Mr. Quinn "has failed to assert a cognizable property interest under the Constitution, and . . . he has failed to plead any facts whatsoever to describe what process he alleges was due to him and how such due process was denied." Defs.' Mem. at 12. They also argue that because Mr. Quinn has alleged a cause of action under the Equal Protection Clause, "he may not also seek to do so under a substantive due process theory." *Id*.

Mr. Quinn has not responded to this argument, and has not specified whether he intended to assert a substantive or procedural due process claim.

In their reply, Defendants argue that Plaintiff's failure to respond to Defendants' due process arguments renders his claim abandoned. Reply at 6.

The Court agrees.

Because Plaintiff has not articulated a procedure in which he was denied due process, the Court interprets Plaintiff's claim to be one of substantive due process.

"[W]here a § 1983 plaintiff alleges a cause of action protected by an explicit textual source of the Constitution, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing that claim." *Reed v. Town of Branford*, 949 F. Supp. 87, 90 (D. Conn. 1996) (internal quotation marks omitted) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "[L]oss of employment coupled with reputational harm [may] implicate[] cognizable liberty interests." *Id.* 90-91 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

Mr. Quinn alleges "severe financial harm and loss, loss of employment rights, duties, obligations or benefits, severe emotional distress, loss of personal and professional reputation, humiliation, embarrassment, loss of privacy, . . . anxiety, inconvenience, physical harm, loss of property, and loss of employment opportunities" as a result of Defendants' actions. Compl. ¶ 41. But Mr. Quinn fails to specify which constitutional rights were violated or which rights he invokes. Mr. Quinn potentially could "establish that he was deprived of a valid 'property interest' in a constitutionally-protected benefit," *Kaluczky*, 57 F.3d at 210, but makes no specific allegations as to what his "loss of property" consists of or how, more specifically, he suffered "severe financial harm and loss," Compl. ¶ 41.

Without more specific allegations, Mr. Quinn's Complaint cannot sustain a substantive due process right. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)); *see also Velez*, 401 F.3d at 94 (plaintiff's substantive due process claim, based on allegations of violations of equal

protection, were "either subsumed in her more particularized allegations, or must fail" because defendants' actions were not egregious as a matter of law).

Accordingly, Mr. Quinn's substantive due process claim will be dismissed.

### D. The Negligent Supervision Claim

"A claim for negligent supervision establishes direct liability for an employer who fails to exercise reasonable care in supervising an employee." *Dumas v. The Price Chopper, Inc.*, No. WWMCV095004896S, 2010 WL 1889036, at *2 (Conn. Super. Ct. 201)) (citing *Seguro v. Cummiskey*, 82 Conn. App. 186, 191 (2004)). "To state a claim for negligent supervision, a plaintiff must plead and prove that he suffered an injury due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise." *Abate v. Circuitt-Wise, Inc.*, 130 F. Supp. 2d 341, 344 (D. Conn. 2001).

The employer owes a duty only if "the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Id.* at 345 (citation omitted). "While no Connecticut case appears to spell out the elements of a claim for negligent supervision, it appears that such a claim must allege an injury in tort." *Deguzman v. Kramer*, No. 3:04-cv-2064 (JCH), 2005 WL 2030447, *2 (D. Conn. Aug. 23, 2005). Courts consider "whether a plaintiff can prove the four elements of a standard claim for negligence." *Id.* (citing *Seguro*, 82 Conn. App. at 192). "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *McDermott v. State*, 316 Conn. 601, 609 (2015) (citing *LePage v. Horne*, 262 Conn. 116, 123 (2002)). Within the duty prong, "there are two distinct considerations." *LePage*, 262 Conn. at 123. "First it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty." *Id.*

Defendants argue that the negligent supervision claim should be dismissed as both the City of Bristol and Chief Gould in his individual capacity are entitled to governmental immunity, Defs.' Mem. at 13, and that any release of governmental immunity from common law negligence requires specific statutory abrogation, *id.* at 14. In their view, the issues raised here involve discretionary actions, making governmental immunity applicable. *Id.* at 15. Furthermore, Defendants contend that Mr. Quinn must, and has not, alleged any exception to governmental immunity to a municipal employee's discretionary act. *Id.* at 16.

Mr. Quinn does not respond to this argument.

Defendants reply that Mr. Quinn abandoned his negligent supervision claim by failing to brief the argument in his opposition. Reply at 6.

The Court agrees.

Connecticut General Statute § 52-557n(a)(2), in pertinent part, provides:

> (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

Conn. Gen. Stat. § 52-557n(a)(2)(A)-(B). It is well-settled in Connecticut that "a municipal corporation is not liable for negligence in the performance of a governmental function." *Williams v. City of New Haven*, 243 Conn. 763, 766 (1998) (quoting *Gordon v. Bridgeport Hous. Auth.*, 208 Conn. 161, 165 (1988)). Only a statute abrogates municipal immunity from liability for negligence. *Id.* at 767. In contrast, municipal employees maintain "qualified immunity in the performance of a governmental duty, but [ ] may be liable if he misperforms a ministerial act, as

opposed to a discretionary act . . . ." *Durrant v. Bd. of Educ.*, 284 Conn. 91, 95 n.4 (2007) (citation omitted).

"[M]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." *Id.* (citation omitted). Immunity from the performance of discretionary acts is subject to three exceptions: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws . . .; and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." *Evon v. Andrews*, 211 Conn. 501, 505 (1989) (internal citations omitted).

Mr. Quinn has not identified any statutory abrogation which would suggest the City of Bristol is subject to liability. *See* Compl. ¶¶ 40-41; Pl.'s Opp'n (failing to mention a statutory abrogation).

Chief Gould's liability in his individual capacity, however, depends on whether or not his actions were ministerial or discretionary, and, if he used his discretion, his alleged liability could be an exception. *See Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (finding that a determination of qualified immunity as to state law claims turns on state law).

"Government acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature[,]. . . .ministerial acts are performed in a prescribed manner without the exercise of judgment or discretion. . . . " *Rodriguez v. Abbatiello*, 30 F. Supp. 3d 274, 277 (D. Conn. 1998). Acts performed "for the direct benefit of the public [ ] are supervisory or discretionary in nature." *Martel v. Metropolitan District Comm'n*, 275 Conn. 38, 48-49 (2005), *abrogated on other grounds by Ventura v. Town of E. Haven*, 330 Conn. 613

(2019); *see Martel*, 276 Conn. at 50-1 (defendants judgment "in determining whether to supervise, inspect and maintain the trails" were duties that "inherently required the exercise of judgment); *Evon*, 211 Conn. at 505-07 (action resulting from a failure to inspect adequately a rental dwelling was discretionary because the inspection involved the exercise of judgment). "[A]s a general rule, '[p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer.'" *Ventura*, 330 Conn. at 631 (second alteration in the original) (quoting *Smart v. Corbitt*, 126 Conn. App. 788, 800 (2011)).

Mr. Quinn's allegations against Chief Gould are directed against his actions as a supervisor and the disciplinary decisions he allegedly made or the actions he allegedly encouraged other officers to take against Mr. Quinn. Because these actions are discretionary, Mr. Quinn's claims against Chief Gould cannot proceed. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief." (internal quotation marks omitted)).

Accordingly, the negligent supervision claim against the City of Bristol and Chief Gould in his individual capacity will be dismissed.

### E.  Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress claim, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011) (citing *Appleton v. Bd. of Educ.*, 264 Conn. 205, 210 (2005)). "Whether a defendant's

conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . . . Only where reasonable minds disagree does it become an issue for the jury." *Geiger v. Carey*, 170 Conn. App. 459, 497 (2017) (quoting *Gagnon v. Housatonic Valley Tourism District Comm'n*, 92 Conn. App. 835, 846 (2006)). Extreme and outrageous conduct is conduct that goes "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Id*. (quoting *Appleton*, 254 Conn. at 210-11). "In order to state a cognizable cause of action, Plaintiff must not only allege each of the four elements, but also must allege facts sufficient to support them." *Golnik v. Amato*, 299 F. Supp. 2d 8, 15 (D. Conn. 2003); *see also Biro v. Hirsch*, 62 Conn. App. 11, 20 (2001) ("All four elements must be established to prevail on a claim for intentional infliction of emotional distress.").

Conn. Gen. Stat. §52-557n abrogates governmental immunity for a municipality and its officials. *Martin v. Town of Westport*, 108 Conn. App. 710, 729 (2008). Under this statute, "a political subdivision of the state shall not be liable for damages to person or property caused by: (A) [a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct[,]" unless otherwise provided by law. Conn. Gen. Stat. § 52-557n(a)(2)(A). "[B]ecause recovery for intentional infliction of emotional distress, unlike that for negligent infliction of emotional distress, requires an intent to cause injury; the safety interest of employees in being protected from intentional infliction of emotional distress is greater than the 'safety interest in being protected from negligent infliction of emotional distress.'" *Benton v. Simpson*, 78 Conn. App. 746, 757 (2003) (*quoting Perodeau v. Hartford*, 259 Conn. 729, 758 (2002)).

Defendants argue that Mr. Quinn's intentional infliction of emotional distress claim against both the City of Bristol and Chief Gould in his official capacity should be dismissed, because they are entitled to governmental immunity. Defs.' Mem. at 6. With regard to Chief Gould specifically, Defendants argue that Plaintiff's allegations that "he was more closely monitored than other employees and subject to internal affairs investigations," which found the allegations of misconduct substantiated, do not "rise to the level of extreme and outrageous" behavior. *Id.* In their view, "disciplinary action and investigations into alleged misconduct may reasonably be expected in a work environment, and are not actionable under a theory of intentional infliction of emotional distress." *Id.*

Mr. Quinn argues that Chief Gould, in his individual capacity, "has engaged in outrageous behavior, language and abuse as detailed in the plaintiff's Complaint." Pl.'s Opp. at 14. Chief Gould's conduct "is intolerable in civilized society[,]" and the motion to dismiss must be denied. *Id*.

Defendants reply that Mr. Quinn's allegations are conclusory and fail to identify what extreme or outrageous behavior by Chief Gould support his claim. Reply at 4.

The Court agrees.

Mr. Quinn's memorandum in opposition refers only to Chief Gould in his individual capacity, *id.* at 14, and the Court has already dismissed this claim against Chief Gould in his official capacity. The Court therefore only will analyze the intentional infliction of emotional against Chief Gould in his individual capacity. *See Benton*, 78 Conn. App. at 756 (finding that intentional infliction of emotional distress claims may proceed against individual employees).

Whether a defendant's conduct is "extreme or outrageous" is critical to an intentional infliction of emotional distress claim. "'Conduct on the part of the defendant that is merely

insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.'" *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 211 (2000) (quoting *Mellaly v. Eastman Kodak Co.*, 42 Conn. Sup. 17, 19 (1991)). Allegations of discrimination, discipline, and harassment have been found insufficient to support a claim for intentional infliction of emotional distress. *White v. Martin*, 23 F. Supp. 2d 203, 208 (D. Conn. 1998) ("[T]he plaintiff has alleged in the most general of terms that [a defendant] discriminated against him, disciplined him, denied him a promotion, and harassed him. These allegations fall short of misconduct which exceeds 'all bounds usually tolerated by a decent society.'"); *see also Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527 (2012) (collecting cases). Mr. Quinn's allegations do not contain specific allegations against Chief Gould or specific discriminatory actions taken by Chief Gould.

Rather, Mr. Quinn seeks an intentional infliction of emotional distress claim against Chief Gould because of his role as a supervisor and the harassment or discrimination which occurred as a result of his direction or his oversight. His pleadings, however, fail to allege "conduct in the present case [which meets] this high threshold." *Perez-Dickinson*, 304 Conn. at 527; *see Voccola v. Rooney*, 136 F. Supp. 3d 197, 211 (D. Conn. 2015) ("[D]iscrimination is not *per se* extreme and outrageous."); *see also Twombley*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

Accordingly, Mr. Quinn's intentional infliction of emotional distress claim will be dismissed.

### F.  Municipal Liability

A municipality is only subject to liability under § 1983 when the violation of the plaintiff's federally protected right is attributable to the enforcement or execution of a municipal policy, practice, or custom. *See Monell*, 436 U.S. at 694. "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996). Instead, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988) (internal quotation marks and citation omitted). Furthermore, "plaintiffs must show that the official policy, practice or custom was the 'moving force [behind] the constitutional violation,' [] which is to say that it actually caused the deprivation." *Hernandez v. Conn. Court Supp. Servs. Div.*, 726 F. Supp. 2d 153, 156-57 (D. Conn. 2009) (internal citations omitted).

"[T]o prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

"Courts have recognized four ways for plaintiffs to demonstrate a policy or custom: (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers [ ]; (2) conduct ordered by a municipal official with policymaking authority [ ]; (3) actions taken pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels [ ]; or (4) a failure to train municipal employees that amounts to deliberate indifference to the rights of persons with whom

the [employees] come into contact[.]" *Walker v. City of N.Y.*, No. 12 CIV. 5902 PAC, 2014 WL 1259618, at *2 (S.D.N.Y. Mar. 18, 2014) (internal quotation marks omitted) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

Defendants argue that Mr. Quinn alleges "conclusory statements [which] do not set forth any factual allegations with respect to identifying what policies or customs exist as a result of the City's deliberate indifference to violations of constitutional rights." Defs.' Mem. at 24. In their view, Mr. Quinn's allegations also fail because they "are predicated solely on naked assertions and Plaintiff has pled no facts whatsoever to sufficiently allege[] that the city has a policy or custom [] result[s] [from] the City's deliberate indifference to the violation of constitutional rights[.]" *Id.*

Mr. Quinn argues that he "has more than stated a case showing deliberate violations by high ranking, policy-setting individuals such [as] the Chief, and numerous Supervisors." Pl.'s Opp'n at 15. He contends his allegations demonstrate "a pattern of discrimination, and retaliation against [] [Mr. Quinn]" and that defendants "harass[ed] him and creat[ed] a hostile work environment. . . and fabricat[ed] false charges to punish" him. *Id.*

Defendants reply that Mr. Quinn "has failed to allege the existence of a municipal policy or custom that violates his constitutional rights, [and] that [he has] provided [no] facts as to how policymakers have engaged in conduct resulting in the denial of his constitutional rights or even what constitutional rights he alleges to have been denied." Reply at 5.

The Court disagrees.

Mr. Quinn alleged enduring frequent, persistent, and widespread harassment. Compl. ¶¶ 25-37. Chief Gould also allegedly condoned the actions and conduct against Mr. Quinn. Compl.

¶ 31 (Chief Gould gave only a "verbal reprimand" after Mr. Quinn filed a formal complaint). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that official's inaction constitutes a 'deliberate choice,' that acquiescence may be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (other citations omitted)). Thus, Mr. Quinn has sufficiently stated a claim under this theory.

Mr. Quinn also alleges facts sufficient for a claim of municipal liability under a theory of inadequate training. At the motion to dismiss stage, a plaintiff "need only plead that the city's failure to train caused the constitutional violation[.]" *Amnesty Am.*, 361 F.3d at 130 n.10. For this theory, he must "establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that the deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation," *i.e.*, "that 'the officer's shortcomings. . . resulted from. . . a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* at 129-30 (quoting *City of Canton*, 489 U.S. at 390-91).

"[W]hile *Monell* permits claims for the failure to have an adequate training program or to adequately supervise employees, such claims also require a showing of 'deliberate indifference.'" *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 303 (D. Conn. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).

"Deliberate indifference in this context may be demonstrated by evidence that there were 'foreseeable serious consequences' that could result from the absence of an adequate training

policy or that the municipality 'fail[ed] to act in response to repeated complaints or constitutional violations by its officers.'" *Id.* (quoting Erwin Chemerinsky, Federal Jurisdiction, § 8.5 (4th ed. 2003)); *see also Voccola*, 136 F. Supp. 3d at 209-10 (a municipality may be liable "when a municipality's failure to adopt a policy or custom demonstrates deliberate indifference to the violation of the plaintiff's constitutional rights"); *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("It is sufficient to show . . . that a discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute a 'custom or usage with the force of law,' or that a discriminatory practice of subordinate employees was 'so manifest as to imply the constructive acquiescence of senior policy-making officials[.]'" (citations omitted)). "[T]he relevant inquiry is whether municipal policymakers had either actual or constructive knowledge of subordinates' unconstitutional practices and nonetheless permitted them to continue." *Hardy v. Town of Greenwich*, 2008 WL 5117370, at *4 (D. Conn. Dec. 3, 2008) (citing *Amnesty Am.*, 361 F.3d at 126).

Here, Mr. Quinn has alleged having been monitored and scrutinized and having been disciplined more harshly as a result. Compl. ¶¶ 14-15,  17. Supervisors allegedly made a false complaint which resulted in Mr. Quinn's arrest and made false statements which resulted in his investigation and discipline. *Id.* ¶¶ 20-22. Supervisors also allegedly encouraged other officers to make these false statements against him, *id.* ¶ 23, and allegedly tolerated racist statements made by other officers, and potentially made by said supervisors. *Id.* ¶ 27. Officers and supervisors were allegedly instructed to document as much as they could, so that Mr. Quinn would be written up for any infraction, and ultimately terminated him from the police force. *Id.* ¶¶ 32-36. Mr. Quinn filed formal complaints against two of the defendants. *Id.* ¶ 31. All actions allegedly were

taken because of his race. His formal complaints indicate that Chief Gould knew or should have known of the ongoing problematic behavior.

Construing all of these allegations in the light most favorable to Mr. Quinn, as the Court must at this stage, he has sufficiently alleged a custom or policy of the City of Bristol Police Department to ignore, rather than address, racial discrimination against a Hispanic officer. *See Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (plaintiff did not need to prove active participation from a police commissioner, it was enough to demonstrate "that the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers."); *cf. Carmichael v. City of N.Y.*, 34 F. Supp. 3d 252, 263 (E.D.N.Y. 2014) ("'[I]solated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability.'" (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012)).

Accordingly, the motion to dismiss Mr. Quinn's *Monell* claim will be denied.

### G. Punitive Damages

Defendants argue that it is well-settled law "that punitive damages may not be assessed against municipalities." Defs.' Mem. at 24.

Plaintiff does not respond to this argument.

In their reply, Defendants argue Mr. Quinn has abandoned his claim by failing to respond to it. Reply at 7.

The Court agrees.

Municipalities may not be exposed to punitive damages under § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("In sum, we find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith action of

its officials."). "Although a municipality itself is immune from a claim for punitive damages, that immunity does not extend to a municipal official sued in his individual capacity." *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 123 (2d Cir. 2006).

Mr. Quinn impermissibly asserts a claim for punitive damages against the City of Bristol.

Accordingly, the motion to dismiss any claim for punitive damages will be granted.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part and DENIED in part**. All claims against Chief Gould in his official capacity are dismissed.

The equal protection claim against Chief Gould in his individual capacity and the *Monell* claim against the City of Bristol will both proceed.

The substantive due process claim is dismissed against Chief Gould in his individual capacity. The negligent supervision and intentional infliction of emotional distress claims are dismissed as to Chief Gould in his individual capacity and the City of Bristol.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of March, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE